565 So.2d 337 (1990)
Todd Patrick NEELY, Appellant/Cross Appellee,
v.
STATE of Florida, Appellee/Cross Appellant.
State of Florida, Appellant,
v.
Todd Patrick Neely, Appellee.
Nos. 87-1095, 89-0863.
District Court of Appeal of Florida, Fourth District.
June 27, 1990.
*338 Russell J. Ferraro, Jr. of McManus, Stewart, Ferraro & Schwarz, P.A., Joseph Negron, Jr. of Steger & Steger, Stuart, and Edwin M. Sigel, Dallas, Tex., for appellant/cross appellee/appellee.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Richard G. Bartmon, Sp. Asst. Atty. Gen., Stuart, and Diane E. Leeds, and Joy B. Shearer, Asst. Attys. Gen., West Palm Beach, for appellee/cross appellant/appellant.
ANSTEAD, Judge.
We sua sponte consolidate these appeals and remand this cause to the trial court for further proceedings consistent with the trial court's order granting the appellant, Todd Patrick Neely, a new trial.

PROCEDURAL POSTURE
These proceedings involve an appeal by Neely from judgments of conviction for attempted murder and burglary, and a subsequent appeal by the state from a post-trial order granting Neely a new trial pursuant to a petition for writ of error coram nobis. During the pendency of Neely's appeal, the state provided Neely's counsel with a report prepared by the Florida Department of Law Enforcement indicating the existence of evidence that some one else may have committed the crimes. Subsequently, we relinquished jurisdiction to the trial court for consideration of Neely's request for a new trial by petition for writ of error coram nobis. After an evidentiary hearing, the trial court granted the petition and ordered a new trial on the grounds that there was substantial evidence that someone else may have committed the crime, and that the state had improperly failed to disclose this evidence to the defendant.

MATERIAL FACTS
The evidence upon which Neely's conviction is predicated reflects that the female victim was attacked in her home in the River Pines residential development on the evening of June 17, 1986. The attacker first appeared at the victim's door and, following a struggle just inside during which the victim was stabbed, the attacker fled. The victim phoned a male friend who had been with her at her home earlier in the evening. She also phoned the police by dialing 911 and identified her attacker as a 15 or 16 year old boy with light brown hair and braces on his teeth. This description was repeated to the police officers who came to her home to investigate.
Subsequently, while receiving treatment at a local hospital, the victim identified Neely, who also lived in River Pines, as the attacker, from a photographic lineup that included a high school photograph of Neely that was several years old. The victim later retracted her statement that the attacker wore braces, and also changed her *339 estimate of the age of the assailant to be 17 or 18 years old. The victim's male friend testified that he could identify Neely from the outline of a young person he had seen while leaving the victim's home shortly before the attack.
The defense presented substantial testimony and other evidence that Neely was present with his family and a friend at a restaurant far away from the victim's home during the time of the attack. After a bench trial, the trial judge found Neely guilty of attempted murder and burglary, and subsequently denied Neely's motion for new trial.

FIRST MOTION FOR NEW TRIAL
After the trial, Neely renewed a motion for judgment of acquittal based on the assertion that the evidence presented at trial was legally insufficient to prove Neely's guilt. In addition, he filed a motion for new trial alleging three grounds: 1) newly discovered evidence of another suspect which could not have been discovered prior to trial despite due diligence by the defense; 2) failure of the state previously to disclose evidence of the other suspect; 3) failure of the state to establish its case beyond a reasonable doubt in light of Neely's alibi defense. The post-trial motions were decided in two phases. An initial order was entered denying the motion for judgment of acquittal and rejecting ground 3 (Neely's alibi defense) of the motion for new trial. The trial judge assigned to another judge the disposition of grounds 1 (newly discovered evidence) and 2 (discovery violation) based on the trial judge's view that another judge could more easily exercise objectivity on those issues, having not heard the evidence presented at trial.
The motion for new trial alleged that at 6:15 a.m., on the day following Neely's conviction, defense counsel, Russell Ferraro, received a telephone call from John Talliere, a resident of River Pines. Talliere and his wife had just read of Neely's conviction in the morning paper and had called to express their shock over the outcome of the trial. Talliere stated that immediately following the attack, a female police officer canvassing the neighborhood had shown his wife Kathy a composite drawing of the assailant drawn from the victim's description, and Mrs. Talliere had affirmatively identified the person in the drawing as a 16-year old neighbor. She told the police that the young neighbor wore braces and had committed several sexually deviant acts in the presence of her and her daughter. Mrs. Talliere stated that she had seen the 16 year-old peeping at her in her bedroom, and that her 10-year old daughter had reported to her that he had exposed himself to her. Although Mrs. Talliere had been unable to identify the young man by name to the police officer, she informed her that he lived in Unit 919 across the parking lot from the Tallieres and would often be seen in the area between 8  10 p.m. running around with other kids.
Mrs. Talliere also described a conversation she had had the day after the stabbing with the victim's male friend. After hearing the male friend's description of the assailant as a young kid with braces, she told the male friend about the young neighbor who fit the description. She further stated that about one week after the stabbing, the family in Unit 919, including the boy with braces, had moved and never returned. Mrs. Talliere subsequently called a woman detective at the sheriff's office whose name was supplied to her by the victim's male friend. That detective came to her house with the police composite drawing which she immediately identified as being the young man with braces in Unit 919. She further stated that she called the police several times to ask what had happened with the young man she had identified, but was told only that the officers were still working on the case.
Ferraro also asserted that he had never been told by the state prior to trial that an identification of a suspect other than Neely had ever been obtained by the police. Ferraro filed an affidavit from Joseph Negron, Jr., an attorney who had assisted in the investigation of this case, to demonstrate that the defense had made diligent efforts to identify the assailant. Negron attested to having canvassed River Pines on seven *340 separate occasions after the crime in an effort to discover other suspects or evidence. In addition, he assigned an investigator to investigate another individual who had been considered, but was subsequently dismissed, as a suspect in the case.
Also attached to the motion was an affidavit from Joann Fantozzi, a licensed private investigator. In the affidavit, the young man who lived in Unit 919 was described as a white male, with dental braces, approximately 15 years old, with brown hair and brown eyes, a thin build, and approximately 5' 5" tall. The Talliere's daughter reported to Fantozzi that the young man had exposed himself to her about 4 months before the stabbing, and that she would often see him in the immediate area known as the boardwalk, where he would smoke with other youths. Fantozzi's affidavit identified the young man in Unit 919 as Dennis Raether and reported that he was presently enrolled at the Riverside Military Academy in Gainesville, Georgia.

THE STATE'S RESPONSE
The state filed a memorandum in opposition to the motion for new trial asserting that no discovery violation had occurred because, contrary to the Tallieres' statements, the police officer who canvassed the area, Detective Laura Murphy, had never been given a positive identification of the suspect residing in Unit 919. The state asserted that although Detective Murphy had canvassed the area, her investigation had revealed no leads, and consequently her name need not have been supplied to the defense in response to the demand for discovery. The state also contended that even if the state's failure to disclose Murphy's investigation did constitute a discovery violation, no prejudice was suffered as a result of the violation since the defense had been apprised in a deposition of Detective Steele Ritter that the police had canvassed the neighborhood and Ritter had supplied the names of the officers who had done the canvassing. The state also claimed that the newly discovered evidence offered by Mrs. Talliere was suspect and even if it was not, it would not have changed the court's verdict.
Attached to the state's motion were several affidavits:
1) Detective Laura Murphy acknowledged that she had interviewed Mrs. Talliere, but denied that Mrs. Talliere had identified anyone as a suspect. Murphy also acknowledged that Mrs. Talliere mentioned a suspicious Jeep Wagoneer with wood sides, but Murphy did not understand the Jeep to be related to the stabbing. Murphy stated that she had written no report about her interview with Mrs. Talliere because it had produced no leads or suspects and she had verbally informed Detective Ritter of this result.
2) Detective Ritter attested to having showed defense counsel Ferraro two (2) canvassing sheets at Ritter's deposition after telling Ferraro that the canvass had produced no leads, but does not recall Ferraro making copies of those documents. Attached to Ritter's affidavit was an excerpt from his deposition in which he reports that the canvassing had produced no leads or information about the crime.
3) Deputy Sheriff Ken Ault, a K-9 officer, confirmed that he had been unable to track the suspect at the victim's townhouse because the male friend had contaminated the area by searching outside the townhouse after the attack.
4) Martin County Sheriff's Office Records Custodian, Lt. Jay King, stated that after a review of the central records file, he could find no record of any officers being dispatched in response to a call made by the Tallieres.
After an initial hearing on the motion for new trial, during which the court heard arguments but declined to receive evidence, the court concluded the hearing by giving each party one week in which to file additional affidavits. The defense submitted additional affidavits:
1) John Talliere attested to having personally observed his wife positively identify to a female police officer a composite drawing as being the young man with braces in Unit 919.
*341 2) Kathy Talliere stated that she had told Detective Murphy that the boy with braces drove a white Bronco "Woody Wagon" with wooden sides and that she had seen him smoking on the boardwalk near her home with other teenage boys. She further stated that shortly after she identified the young man for Detective Murphy, she called several people including her mother-in-law, Mrs. Jan Hull, to tell them of her identification of the assailant to the police.
3) Mrs. Jan Hull, Kathy Talliere's mother-in-law, signed an affidavit confirming that Kathy Talliere had called her shortly after the crime, and told her that she had identified a composite drawing shown to her by the police department as a neighbor who had exposed himself to her daughter some months prior.
4) Ferraro signed an affidavit in which he stated that had he seen the entry beside the Tallieres' names on the canvas sheet prior to the trial, he would have thoroughly investigated the suspicious circumstances and would have pursued the leads which Mrs. Talliere had provided. The pertinent page of the police department's canvassing report including the Tallieres' names and the "Bronco" vehicle description was also filed with the court.
At a subsequent hearing on the motion for new trial, the state conceded that "to the best of [the prosecutor's] knowledge," the defense did not know about Dennis Raether, the suspect identified by Mrs. Talliere. The prosecutor also stated that as far as he knew, the state was also unaware of Dennis Raether, and acknowledged that the court would be charged with the task of making a factual finding on whether or not Detective Murphy had been informed of Raether as a suspect based on the conflicting affidavits of the Tallieres and Detective Murphy relating to that issue. A factual dispute also surrounded the issue of whether or not Detective Ritter was telling the truth when he claimed by affidavit that at this deposition he had handed the two canvassing sheets to Attorney Ferraro who had simply handed them back to him without copying them. The trial court denied the motion for new trial.

CORAM NOBIS PROCEEDINGS
As noted earlier, the application for coram nobis relief was filed during the pendency of this appeal. The application was apparently prompted by two significant events: first, the disclosure by the Assistant Attorney General representing the state on appeal of the existence of previously undisclosed police canvassing reports containing evidence of another suspect; and, second, a Florida Department of Law Enforcement report identifying Dennis Raether as a suspect in the crime and the state's knowledge of Raether prior to trial.
At a subsequent evidentiary hearing, much of the evidence received was similar to that relied on in the earlier motion for new trial. Significant, however, was the presentation of evidence of the state's possession of additional canvassing sheets, previously undisclosed to the defense, which supported the Tallieres' statements. Russell Ferraro testified that pursuant to the criminal rules of discovery he had demanded before trial that the state produce the names and addresses of all persons known to the prosecution to have relevant information concerning the case. He was never informed that a person named Dennis Raether was implicated in the case, and he did not receive any police canvass sheets nor was he aware of any canvass reports prior to trial. He testified that he first found out about two canvass reports when he deposed Officer Murphy, shortly before a hearing on the motion for new trial, but that he did not discover the additional canvass reports until the Attorney General's office spontaneously provided those as attachments to pleadings filed in the court of appeal. He did not discover the existence or identity of Dennis Raether until the day after the trial when he talked with the Tallieres. Ferarro further testified that he would have pursued the Tallieres had he been given the canvass reports because those reports clearly disclose Kathy Talliere's suspicion of Raether as the attacker.
*342 Detective Ritter testified that he was heavily involved in the investigation and that he always doubted the Neely identification. He retracted earlier testimony that Ferraro had seen any canvassing reports, testifying instead that the reports, which the prosecuting attorney had the entire time, were never removed from the folder in which they were kept. In fact, he said that the prosecutor reprimanded him for even bringing up the existence of the canvass reports, much less bringing the actual reports to his deposition. The prosecutor told him he should not offer anything to defense counsel that was not specifically requested. In his professional opinion, Detective Ritter felt that more investigation was required in the case in light of the information that arose during the initial investigation. He was not personally made aware of Kathy Talliere's persistent calls to the police to offer information about Raether.
Officer Murphy testified that she participated in the canvass procedure and had talked to the Tallieres. She acknowledged that she noted their identification of the Raether family car on her canvass reports. She said that when she was deposed she brought with her only the two reports she personally prepared.
Officer Murphy's supervisor testified that he recalled the entire canvassing procedure in which he also participated, and that he remembered several remarks on the reports about suspicious cars and possible suspects reported by the neighbors. He stated further that he felt the comments he wrote on his canvass sheets were important, and that he intended them to cause additional investigation by other officers assigned to the case, but that additional investigation apparently never ensued.
Kathy Talliere testified that she spoke with the victim's friend the day after the attack. He told her that he had been with the victim the evening of the stabbing but left before the actual event. He described the suspect to her as a fourteen or fifteen year old boy with light brown hair and braces. Eventually, Mrs. Talliere said that Officer Murphy came to her house while conducting a neighborhood canvass and showed her a composite drawing prepared from the victim's description. She told Murphy that the drawing looked like the boy who lived across the parking lot from her who wore braces. Talliere also testified that she repeatedly called the police offering information about the boy across the parking lot, who was constantly involved in mischievous activities.
Mr. Talliere testified that the day after appellee was convicted, he read about the conviction in the local newspaper, and called Ferraro to inform him the wrong person had been convicted. He recalled being present when his wife identified the subject of the police composite as Raether.
Several of Raether's schoolmates, at both his Florida and Georgia schools, testified that Raether told them that he was involved in a stabbing in Florida for which the police had arrested someone else. Other witnesses testified that they heard Raether admit his guilt to his mother. These witnesses added that most either did not know Raether well enough to know whether to believe him, or did not believe him because they felt he was dishonest.
The trial judge's order granting the petition also provides a summary of the evidence presented at the hearing as well as the reasons a new trial was granted:
The primary issues before this Court are two. One, did the State commit a deliberate discovery violation; and, two, did that violation prevent the Petitioner and his trial counsel from discovering evidence that would have prevented entry of a judgment of conviction at the trial of this case.
The other matters concerning the ineptness of the investigation by the police or the weight given the alibi evidence by the trial judge are matters for the appellate court to decide.
On August 19, 1986, Detective Steel (sic) Ritter, the lead investigator of this case was deposed by defense counsel. He was accompanied by the then Assistant state Attorney Peter M. Neil. As the deposition was ending, defense counsel asked Mr. Ritter if there was anything *343 he knew about the case that counsel had not asked about. He replied that there had been a canvass of the neighborhood several weeks after June 17, 1986, but nothing significant had been found. He did not mention that the four officers who conducted the canvass had made written reports.
Joseph Negron Jr., then a prospective member of the bar and now an attorney for the Petitioner, testified at this hearing exactly how Detective Ritter told about the canvass. This evidence convinced the Court that Mr. Ritter did not indicate anything about written canvass reports, which, had they been known to the Defendant at that time, could lead to strong and convincing evidence that someone else committed the crime with which the Petitioner was charged and later convicted.
This Court is convinced that failure to disclose this evidence was innocuous at that point. However, according to the tesimony (sic) of Detective Ritter immediately after the deposition was concluded, the then Assistant State Attorney, Peter M. Neil, reprimanded the Detective for having mentioned the neighborhood canvass, and told him, in effect, to never give defense counsel any information about the case unless he was specifically asked for information.
Unfortunately, this is only the first instance of the then Assistant State Attorney's interference or intentional failure to disclose details of the case.
When defense counsel received a phone call the morning after the Petitioner's coviction (sic), he immediately investigated the alarm sounded by his caller. As a result of this call, defense counsel took the deposition of Detective Laura Murphy and obtained from her two written canvass reports for the first time. When questioned by the trial judge at the hearing on the Motion for New Trial, Mr. Neil again did not inform the Court that there were additional canvass sheets in the hands of the State. He further stated that the State knew nothing about a person named Raether, and therefore could not inform defense counsel of what he did not know. The name Don Raether appears on one canvass sheets. It appears that Don is Dennis' brother.
Following the hearing on the Motion for New Trial where the trial judge based his decision solely on affidavits, Mr. Neil effectively removed Detective Ritter from the case when he informed the Detective that the State Attorney's office would handle any further investigation of this case.
There were six more canvass sheets and a summary sheet that came to light only when the Honorable Assistant Attorney General, Diane E. Leeds, filed them as a Supplement to the record on appeal before the District Court of Appeal. In an affidavit filed in this Court by Stipulation of the parties, she swore that she requested and obtained them from Peter Neil, Assistant State Attorney.
This Court finds that Peter M. Neil, the then Assistant State Attorney, knew about the neighborhood canvass sheets at least from August 19, 1986, and purposely kept them from the defense in this case.
Mr. Neil was summoned to appear at this hearing, but chose not to attend.
The remarks column of the canvass sheet show various remarks, some obviously innocuous, and some more intriguing which would prompt further investigation by a well-prepared attorney. It is significant that defense counsel sent his law clerk to the neighborhood on a least six occasions before the trial to seek witnesses and people that knew his client. Armed with the neighborhood canvass reports, there is no reason to believe that Joe Negron, Jr., would have not discovered Mrs. Kathy Talliere and her well-grounded suspicions of Dennis Raether.
When the trial Court heard the Petitioner's Motion for New Trial, it had only an affidavit of Detective Laura Murphy to consider in opposition to the affidavit of Kathy Talliere. The trial judge concluded that there was no reason for the deputy to omit Mrs. Talliere's description of a 15 years (sic) old boy with braces on his *344 teeth. However, this Court had the good fortune to hear the live testimony of both Kathy Talliere and Detective Laura Murphy.
Before this Court, Mrs. Murphy denied that she had been told about the local neighborhood teenager with braces on his teeth who acted strange. She took part in the canvass several weeks after the crime had taken place and well after the Petitioner had been arrested on this charge. She was not told that the early description of the offender included braces on his teeth, nor did the composite indicate that the offender had braces. She didn't even know the address of the victim and testified that she was fearful of knocking on the victim's door or even the door of the perpetrator of the crime. The Court finds that this officer was woefully unprepared for a neighborhood canvass and the Court is not surprised that she didn't enter under the remarks column of the canvass anything about a young man wearing braces.
Another fact leads the Court do (sic) lend credence to Mrs. Talliere's testimony at this hearing. Detective Murphy denied having a further conversation with Mrs. Talliere after the canvass. Mrs. Talliere stated that she had made at least ten attempts to talk to Deputy Murphy, and finally succeed (sic) after speaking to the deputy's immediate supervisor, who later told this Court that he had directed Detective Murphy to contact Mrs. Talliere. All of which leads this Court to believe that Detective Murphy, when told by Mrs. Talliere about the young man who turned out to be Dennis Reather, didn't think braces were important and so failed to note it on her canvass sheet. If the trial judge had heard this testimony, he could not have given the affidavit the weight that he did.
In determining the effect of the newly discovered evidence on the probable outcome of the trial, this Court has heard considerable hearsay evidence. Some of such evidence would be immaterial to the issues in this case, and some would be crucial to the outcome of a trial, depending on who is charged and the handling of it by defense counse. (sic) The statements attributed to Dennis Raether could be admitted in a new trial of this defendant under the authority of Baker v. State, 336 So.2d 364 (Fla. 1976). Many of his admissions and statements concerning this case would be admissable (sic) against Dennis Raether if he were the defendant in some future trial.
This Court concludes and finds that had the newly discovered evidence been presented to the court in the original trial, such evidence would have conclusively prevented the entry of a judgment of guilty against the Petitioner.
The Petitioner has shown by strong and convincing evidence that the then Assistant State Attorney had deliberately and actually suppressed vital information in the hands of the State that could, would, and has led to further probative evidence that would have conclusively led to a different result in the trial court.

ISSUES ON APPEAL
The main issues on appeal are the sufficiency of the evidence to sustain Neely's conviction after the non-jury trial, and the sufficiency of the legal and evidentiary bases for the trial court's subsequent order granting a new trial.[1]
Initially, we reject Neely's claim as to the sufficiency of evidence and his entitlement to a judgment of acquittal as a matter of law. The trial court was initially faced with resolving the direct conflict between the testimony of the victim and her male friend that Neely committed the crime, and the testimony of numerous witnesses presented by Neely that he did not and could not have committed the crime because he was at a distant restaurant at the time the crime was committed. The trial court resolved that conflict against Neely, and we cannot second-guess that *345 decision because it is based on competent substantial evidence.
The ruling on the petition for writ of error coram nobis is similarly immune from our interference. The trial court found that there was newly discovered evidence that would have precluded Neely's conviction. Previously, this court implicitly concluded, in approving Neely's application for coram nobis relief, that his allegations were legally sufficient to justify relief. See Richardson v. State, 546 So.2d 1037 (Fla. 1989). Hence, the issue of legal sufficiency of the petition has already been decided. The role of the trial court, after we authorized a hearing on the coram nobis application, was to determine the validity of the allegations. See Richardson at 1038. The trial court has determined that the allegations were valid, and since there is competent substantial evidence in the record to support that determination, we cannot disturb those findings any more than we could interfere with the original fact-finder's decision on the motion for judgment of acquittal.
There are other reasons for approving the trial court's grant of a new trial. In Richardson the supreme court held that coram nobis proceedings should be limited to situations where the petitioner is no longer in the custody or control of the state. Otherwise, the court concluded, all post-conviction applications for new trial should be presented under Rule 3.850 of the Florida Rules of Criminal Procedure.[2] The requirements for relief under Rule 3.850 are considerably less stringent than the prior coram nobis requirements. While we have concluded that the trial court acted properly even under the strict coram nobis requirements, it is also apparent that, based upon the trial court's findings and conclusions, Neely was also entitled to relief under Richardson and Rule 3.850. That relief was proper based on the trial court's findings as to the claim of newly discovered evidence and the claim of the suppression of evidence by the prosecution. Richardson at 1039. Since there is competent substantial evidence to support the trial court's finding on these issues, we would have to affirm the trial court's decision as a proper exercise of authority under Rule 3.850 and Richardson even if the strict test for coram nobis relief had not been met.
Finally, we must acknowledge that the trial court, once it was determined that the fundamental fairness of the original proceedings was substantially flawed, was really left with little choice but to act to correct that flaw by granting a new trial. In doing so the trial judge has maintained credibility in our system of justice, whose goal to seek the truth is ensured primarily by the fairness of the procedure by which the truth is determined. When faced with similar circumstances, the United States Supreme Court has declared:
We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective *346 of the good faith or bad faith of the prosecution.
The principle of Mooney v. Holohan [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1963)] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." (Footnote omitted). A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile," to use the words of the Court of Appeals. [Brady v. State] 226 Md., [422] at 427, 174 A.2d, [167] at 169. [(1961)]
Brady v. State of Maryland, 373 U.S. 83, 87-8, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215, 218-19 (1963).
The process was fundamentally flawed here when important relevant evidence was kept not only from the defendant, but was not disclosed to two (2) successive trial judges who had the responsibility to decide the guilt or innocence of the defendant, and to act on the defendant's initial application for a new trial.
The integrity of our justice system depends on our strict adherence to the constitutional guarantee of due process. Neither the trial court in granting a new trial, nor this court in approving that action, has made any determination as to the ultimate outcome of this case. It is apparent, however, that no one would be served, including the victim, the defendant, or the community at large, if the justice system left intact a conviction so seriously flawed. We are all the better for the trial court's action.
In accord with the above, we reverse the judgment of conviction, affirm the trial court's order granting a new trial, and remand this cause for further proceedings consistent with that order.
POLEN and GARRETT, JJ., concur.
NOTES
[1] There are other issues raised, mainly by appellant Neely. We either find no merit in those issues, that they were not properly preserved for review, or find that they have been mooted by our decision affirming the grant of a new trial.
[2] The Richardson case was somewhat similar to this one in that the supreme court had relinquished jurisdiction to the trial court to conduct an evidentiary hearing on the defendant's motion for new trial on the grounds of new evidence and prosecutorial misconduct, while coram nobis proceedings were pending in the supreme court. The Richardson court held:

Just as rule 3.850 has absorbed many of the claims traditionally brought under habeas corpus, it has also absorbed some types of newly discovered evidence claims. For example, claims based on alleged knowing use of perjury are currently cognizable in a motion pursuant to rule 3.850, even if based on newly discovered evidence. See [State v.] Matera, 266 So.2d 661 at 663. [(1972)] Claims of the suppression of evidence by the prosecution, which are in essence alleged violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), are also properly brought under rule 3.850, not in an application for a writ of error coram nobis. Smith [v. State], 400 So.2d at 962-63.
There is no principled reason why some claims based on newly discovered evidence must be brought under rule 3.850 and others must be brought under coram nobis. We believe the only currently viable use for the writ of error coram nobis is where the defendant is no longer in custody, thereby precluding the use of rule 3.850 as a remedy.
546 So.2d at 1039.